Kevin F. McCoy
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
550 W. Seventh Avenue, Suite 1600
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KANHA KOUNDUANGTA,<br><br>Defendant. | NO. A06-0018 CR (JWS)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF FIRST MOTION TO SUPPRESS EVIDENCE** |

**I.     Introduction.**

Kanha Kounduangta is a 43-year-old refugee woman from Laos.  Her formal education ended at the fourth primary grade when she was approximately ten years old.  She emigrated from Laos in 1989, and has been a lawful permanent resident of the United States since that time.  She has nine children, five of whom live with her in Anchorage.  Although Ms. Kounduangta has some ability to speak and understand English, that ability is extremely limited.  She has no prior criminal record.  The purpose of this memorandum is to explain why the Fifth Amendment and the Sixth Amendment require that statements taken from her on February 9, 2006, must be suppressed .

II.   **Statement of Facts.**

### The Package

On February 9, 2006, members of the Alaska Interdiction Task Force were conducting an interdiction operation at the United Parcel Service sorting facility in Anchorage. While so engaged, one of the agents observed a parcel wrapped in brown paper. The parcel measured 8.5 inches by 9.5 inches by 13 inches. The parcel had a red label affixed indicating that it had been shipped via "UPS Next Day Air." The ends of the parcel were taped with clear packaging tape.

One of the agents selected the parcel out for closer inspection. He determined that the UPS label identified the shipper as Jason Tourn with a phone number of (360) 882-7588 and that it had been shipped from the UPS Store # 2612 located at 6715 NE 63rd Street, Vancouver, Washington. The number (360) 882-7588 appeared to be associated with someone named Kim Hong-Brett and not with Jason Tourn. The parcel was addressed to Gina Johnson, 9499 Brayton Drive, # 94, Anchorage, Alaska with telephone number (907) 884-8341. The number (907) 884-8341 appeared to be a cell phone number.

Using unidentified law enforcement data bases, the agent determined that there was no record of a Gina Johnson at the residence located at 9499 Brayton Drive, #94, Anchorage, Alaska. Using unidentified law enforcement data bases, the agent determined that there was no record of Jason Tourn in the Vancouver, Washington area or in the state of Washington. Law enforcement exposed the package to a drug detection dog. The dog did not alert.

Using this and other information, the agent obtained a search warrant to open the package. When he opened the package he discovered a small stuffed dog and large chocolate heart

contained in a red heart-shaped box. Inside the chocolate heart, he found approximately 555 grams of methamphetamine. He believed the methamphetamine to be especially pure.

### The Controlled Delivery Plan

After the drugs were found, the agent obtained a warrant authorizing insertion of an electronic monitoring device that would emit a signal whenever the package was opened. After removing most of the drug, the agent reassembled the package with the electronic monitoring device inserted and planned a controlled delivery of the parcel. The officers inserted a theft detection powder inside the package to help identify any person who might open the package.

After the parcel was delivered, the plan was to wait until the electronic monitor indicated that the box had been opened. Because police were not certain when or where the parcel would be opened, they were prepared to follow anyone leaving 9499 Brayton Drive, #94 and follow that person to wherever the parcel was taken and opened. At least ten law enforcement personnel were assigned to surveillance duties.

Once the electronic monitor indicated that the box had been opened, police planned to enter any building, secure the now-opened parcel, the building, and those inside the building until a search warrant could be obtained and relevant evidence seized. There were at least six law enforcement officers assigned to the entry team. One of the officers on the entry team had a battering ram that was designed to break down doors.

### The Controlled Delivery

Number 9499 is the address for a trailer park in Anchorage. The individual trailers at that address are designated by space numbers. That evening, one of the officers dressed up like a U.P.S. driver and delivered the parcel to 9499 Brayton Drive, #94. As ten law enforcement

officers watched Space 94 and the surrounding area in the trailer court, a young woman answered the door and signed for the package.

### The Unopened Parcel Is Taken From The Trailer Park

About 30 minutes later, police watched as a second woman drove up to Space 94 in a jeep. The woman got out of her car and went into the trailer at Space 94. The second woman emerged about ten minutes later carrying the as yet unopened parcel. She got into her jeep, and drove away from Space 94. However, instead of leaving the trailer court immediately, the woman wandered through the trailer court with no apparent destination in mind. One officer said that on two occasions the woman drove her jeep into a cul de sac, stopped, shut off the motor, and switched off the headlights for a period of minutes.

### The Unopened Parcel Is Delivered To A Second Trailer Park

Eventually, the woman left the trailer court at 9499 Brayton Drive and the police followed as she drove to a second trailer court located at 1200 West Dimond Boulevard. The police watched as the woman drove into the second trailer court, again with no apparent destination in mind. Eventually, the officers saw her drive up to Space 529, get out of her jeep and walk up onto the trailer porch at Space 529. The woman made a cell phone call, then returned to her jeep, and again began to drive around the trailer park at 1200 W. Dimond Boulevard. The woman eventually stopped her jeep in front of Space 811 and a man stepped out of that trailer and joined the woman in the jeep. Together they drove back to Space 529, stopped, and got out of the jeep. The police watched as the two of them carried the still unopened parcel into the trailer at Space 529.

**The Parcel Is Opened At The Second Trailer Park**

At 8:41 p.m., after the man and the women entered the trailer at Space 529 with the parcel, the electronic monitor emitted a tone which indicated to the police that the parcel had been opened. With the parcel apparently opened, the ten watching police officers as well as the six members of the entry team assembled for the purpose of entering the trailer at Space 529. They were ready fifteen minutes later.

**The Police Entry**

The entry team quietly sneaked up to the trailer at Space 529. As the six members of the entry team assembled on the stairs and porch of the trailer with weapons drawn, one of the officers pounded on the door, announced police, and demanded entry. The door was opened and the six officers rushed in with weapons drawn. Once inside, the officers saw three people inside the trailer. One was an old woman named Pheng Phiachantharath who was seated in the kitchen. One was a man named Soukthavy Phiachantharath who was in the living room area. Police immediately determined that he was the man from Space 811 who joined the woman in the jeep. The third person was Kanha Kounduangta who was seated at the dining room table eating a meal.

With weapons drawn, the entry team ordered everyone to get down on the floor on their stomachs. Ms. Kounduangta and Mr. Phiachantharath complied and as they laid on the floor two of the officers secured their hands behind their backs with handcuffs. Ms. Phiachantharath is an elderly woman and it is unclear at this point whether she was required to get onto the floor to be handcuffed. While this transpired other officers from the entry team entered each room in the trailer to confirm that there were only three people present at the time of the entry.

After they were certain that everyone had been accounted for, the entry team began to look around the trailer. The saw the stuffed toy dog from the parcel on the dining room table. In the kitchen, on the floor, the saw the now-opened parcel. The unopened red heart-shaped box was found in a glass-fronted kitchen cabinet.

### The Post-Entry Questioning

Next, the police began to question the three people they found inside the trailer for the purpose of determining their relationship to the contraband package and to Space 529. Both Mr. Phiachantharath and Ms. Kounduangta were asked about the package together. According to the DEA 6 disclosed by the government pursuant to Fed.R.Crim.P. 16, Ms. Phiachantharath expressed surprise when asked about the box. He said that he had not seen the box but he admitted that he had seen the small stuffed dog.

The police then focused on Ms. Kounduangta. During the course of questioning that followed, police used Mr. Phiachantharath to interpret some of the questions and some of the answers that Ms. Kounduangta gave. The DEA 6 form explains that police called on Mr. Phiachantharath's translation services when Ms. Kounduangta appeared to give conflicting answers or said that she did not understand a question.

When questioned Ms. Kounduangta at first denied any knowledge of the box. The questioning officers, having earlier seen her retrieve the box from 9499 Brayton Drive, Space 94, showed her the box. When the officers confronted her about the box, Ms. Kounduangta offered a different explanation. She said that the stuffed animal on the table was hers, and that it had come from the box. She explained further that she had gone to visit her friend Gina, who had initially

received the box. Gina, she said, gave her the stuffed animal and the box that it came in. She continued to insist that there was nothing in the box other than the stuffed animal.

The interrogating officers then asked who opened the box and Ms. Kounduangta replied that it had been opened by Gina. As the officers continued to press Ms. Kounduangta, her answers began to change. She then told the officers that Gina had called and said that a box had arrived for her that contained a Valentine's Day present. Ms. Kounduangta then said that the box had been opened when she picked it up. Despite questioning, she was unable to tell the officers where Gina lived or how the officers could get in touch with Gina.

The interrogating officers then decided to question Ms. Kounduangta about the chocolate heart. G.S. Binkley, one of the interrogating officers, pointed to the red heart-shaped box containing the chocolate and asked her what she know about that. Initially, Ms. Kounduangta said that she did not know anything about the red heart-shaped box. When pressed, she finally admitted that it had been in the box with the stuffed animal.

The interrogating officer then focused a black light onto Ms. Kounduangta's hands and the hands of Mr. Phiachantharath and Ms. Phiachantharath. Spots of theft detection powder were detected on Ms. Kounduangta's right hand. No powder was found on the hands of the other two.

G.S. Binkley then told Ms. Kounduangta that several parts of her story were untrue, that her story did not make sense, and that she was going to be arrested for being part of a drug transaction. G.S. Binkley then asked her to help him understand how the drugs ended up in her possession. Ms. Kounduangta explained that she picked up the package from a friend's house.

When asked, Ms. Kounduangta said that she could not identify the friend. She admitted that she opened the parcel and that she indeed had removed the contents.

She admitted driving the jeep and acknowledged that she did not have a driver's license because she had failed her driver's test. She explained that she needed a driver's license because her boyfriend Sonny Annaguey lost his license following a drunk driving conviction.

Eventually, Ms. Kounduangta asked not to be questioned any further explaining that she was afraid that she might give a wrong answer to a question.

### Ms. Kounduangta Taken To The DEA Building On Tudor Avenue And Then To The Anchorage Jail.

The officers arrested Ms. Kounduangta and drove her to the DEA Building on Tudor Road in Anchorage where she was processed. While at the DEA Building, Special Agent Hollingshead watched as Task Force Officer Feliciano read a *Miranda* advisement to Ms. Kounduangta. She was not asked to initial the advisement or to sign a waiver and there is no indication that Ms. Kounduangta ever knowingly and intelligently waived her *Miranda* rights.

Special Agent Hollingshead and Task Force Officer Feliciano remanded Ms. Kounduangta to the Anchorage jail after they completed processing and finished with the *Miranda* reading. On the ride to the jail, Ms. Kounduangta said that she had done nothing wrong and that she had only received a gift.

The matter is now before the court on Ms. Kounduangta's motion to suppress all statements taken from her on February 9, 2006.

**III.     Argument.**

    **A.     Kanha Kounduangta's Statements Must Be Suppressed Because They Resulted From A Police-Dominated Atmosphere Which Overcame Her Will To Resist And Which Resulted In Statements Which Were Not Freely Determined.**

Since *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 416, 80 L.Ed. 682 (1936), it has been virtually axiomatic that the use of coerced statements to convict a citizen of a crime violates due process. The statements at issue in *Brown v. Mississippi* were obtained by physical torture. However, courts have long recognized that psychological coercion also violates due process and requires suppression.

Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden. *Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978). "[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition." *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991) quoting, *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). Determining whether a statement is involuntary requires more than a mere color matching of cases. It requires a careful evaluation of all the circumstances of the interrogation. *Mincey v. Arizona*, 437 U.S. at 401, 98 S.Ct. at 2418. Indeed, the Supreme Court has cautioned that "as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, [the] duty to enforce the constitutional protections does not cease." The case law provides eloquent descriptions of psychological coercion which fit the facts of this case.

The test for voluntariness was discussed at length in *Henry v. Kernan*, 197 F.3d 1021, 1026-27 (9th Cir. 1999).

> A confession is involuntary only if police use coercive means to undermine the suspect's ability to exercise his free will. Voluntariness depends on such factors as the surrounding circumstances and the combined effect of the entire course of the officers' conduct upon the defendant. The test for voluntariness is well established: Is the confession the product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

(citations and internal quotation marks omitted).

The evidentiary hearing will demonstrate that the coercive tactics used in this case include:

- surprise intrusion into a private residence by police without a search warrant;
- isolation;
- language difficulties;
- physical discomfort;
- repeated interruption of Ms. Kounduangta by interrogators as questioners disagreed with her answers;
- accusations that Ms. Kounduangta was lying.

Because these tactics resulted in a statement not freely determined, all of Ms. Kounduangta's statements on February 9, 2006, must be suppressed.

### B.    All Statements Following The Warrantless Non-Consentual Police Entry Into The Trailer At Space 529 Must Be suppressed.

Since 1966, police officers who question a person in custody have been required to recite a prophylactic warning designed to alert the person to his or her Fifth and Sixth Amendment rights.

> Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used against him, and that he has the right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 344-4 (1966). The *Miranda* rule is "grounded in a specific requirement of the United States Constitution." *Dickerson v. United States*, 530 U.S. 428, 439 n. 4 (2000).

The prophylactic rule outlined in *Miranda* and reaffirmed in *Dickerson* is triggered by custodial interrogation. A person is in custody for *Miranda* purposes if the circumstances surrounding the interrogation would cause a reasonable person to be believe that he or she was not at liberty to terminate the interrogation and leave. *Thompsan v. Keohane*, 516 U.S. 99, 112 (1995). The test is an objective one that determines whether the conduct of law enforcement amounted to a formal arrest or a restraint of freedom associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

In the present case, Ms. Kounduangta was in *"Miranda* custody" from the outset of her encounter with the police at Space 529. The evidence at the hearing in this matter will establish that at least six police officers entered the trailer at Space 529. Their purpose was to secure the residence after the electronic monitoring device activated pending application for a search warrant to search the residence. Their plan, after the entry had occurred and the residence was cleared, was to "determine how the people were related to the house and the contraband package." *See* Tab A (DEA Form 6 prepared by Special Agent Hollingshead).

Accordingly, taking advantage of the element of surprise, at least six officers rapidly entered the residence with weapons drawn. The ordered all the occupants found there to get down on the floor on their stomachs. Ms. Kounduangta and Mr. Phiachantharath complied immediately.

The intruding officers immediately handcuffed them with their hands behind their backs as they lay on the floor.

After the intruding officers determined that they had identified and isolated the only three occupants of the trailer, they began to ask questions. The questions were about the contraband parcel and who opened it. As Ms. Kounduangta began to answer their questions the questioning officers expressed dissatisfaction with her answers and confronted her with the box, the stuffed toy dog, and the red heart-shaped box. The officers informed Ms. Kounduangta that her answers were untrue, did not make sense and that she would be arrested for her role in an apparent drug transaction. As they told Ms. Kounduangta this, the questioning continued. As the officers pressed their questions they enlisted the aide of Mr. Phiachantharath as an interpreter.

And ultimately, Ms. Kounduangta was arrested and taken to the DEA building on Tudor Avenue. As it turned out, Ms. Kounduangta was not advised of her *Miranda* rights until after she arrived at the DEA Building for processing. *See* Tab B (memorandum of advisement in DEA Form 6 prepared by unknown agent).

### C. The *Miranda* Advisement By TFO Feliciano Was Ineffective.

Once Ms. Kounduangta arrived at the DEA building for processing, a partial DEA Form 6 indicates that TFO Feliciano advised the now-arrested Ms. Kounduangta of her *Miranda* rights. There is no indication that Ms. Kounduangta understood the advisement or that she was asked to acknowledge the advisement. It was simply read to her. Such an advisement is simply ineffective, without more, to establish Ms. Kounduangta understood her rights and that, if she understood her rights, that she knowingly and intelligently elected to waive her Fifth Amendment rights to silence and to counsel.

A heavy burden "rests on the government to demonstrate that the defendant knowingly and intelligently waived [her] privilege against self incrimination and [her] right to retained or appointed counsel."

In the present case, when the officers pressed Ms. Kounduangta at the trailer, they enlisted one of the residents there to translate some of their questions from English into Laotian and some of Ms. Kounduangta's answers from Laotian into English. Given the cultural and language hurdles evident to the officers at the time, it is inconceivable under these circumstances that Ms. Kounduangta understood her *Miranda* rights or that she knowingly and intelligently elected to waive those rights.

**IV.    Conclusion.**

For these reasons, Ms. Kounduangta asks that all statements taken from her be suppressed.

DATED at Anchorage, Alaska this 16th day of March, 2006.

Respectfully submitted,

s/Kevin F. McCoy
Assistant Federal Defender
550 West 7th Avenue, Suite 1600
Anchorage, AK 99501
Phone:       907-646-3400
Fax:         907-646-3480
E-Mail:      kevin_mccoy@fd.org