U.S. Department of Justice

United States Marshals Service

*District of Alaska*

Anchorage, AK 99513-7568

December 5, 2005


COPY

The Honorable John W. Sedwick
Chief Judge, United States District Court
District of Alaska

Dear Judge Sedwick:

I am writing to you in light of the recent split decision from the 9th Circuit (USA v HOWARD, et. al.) referencing the shackling of prisoners, and the subsequent challenges to the District of Alaska United States Marshals Service (USMS) policy on this issue. As you know, after consulting with you in February of 2003, our office instituted a district-wide policy of leaving leg restraints on prisoners appearing in the District of Alaska in non-jury court proceedings, but removing their handcuffs and waist chains. The exception to this requirement is where the prisoner is medically unable to wear the leg restraints. Our goal in establishing the policy was most assuredly not to apply any punishment to the inmate. Instead, it was to provide the highest degree of security possible in consideration of an ever increasing workload and to safely accomplish our mission of prisoner production. This policy has proven very effective, and I firmly believe it has increased the security of the court proceedings, and added to the safety of all the individuals involved with them, including the defendants.

The Howard decision indicated the 9th Circuit panel does not ... "preclude reinstatement of a similar policy upon a showing of adequate justification." After reading the decision and conferring with the USMS Office of General Counsel representative on this issue, I offer the court the following information as justification for the District of Alaska Marshals Service policy to leave prisoners in leg restraints in non-jury proceedings:

1) The USMS mission to provide a secure environment for the judicial process includes a responsibility not only to the judges, but also to the prosecutor, defense attorney, court staff, witnesses, Deputy U.S. Marshals, Court Security Officers, defendant and members of the public. A policy requiring leg restraints in non-jury proceedings is one of the few pro-active measures we can take to help ensure a secure process.

2) Deputy U.S. Marshals are trained at the USMS academy to properly apply restraints approved for use by the USMS, including leg restraints. Training techniques include the deputies applying the restraints to each other and a requirement to wear them for much of a training day. This ensures the deputies understand the need for proper and safe application, as well as learn what

movement a prisoner is capable of while wearing the leg restraints. The typical set of restraints allows for twenty-two inches of room to take a step. This is enough room to walk up/down steps or get into a vehicle, but not enough to run effectively. It also marginalizes a prisoner's ability to commit an assault.

3) In regard to initial appearances before a magistrate, the arresting agency usually provides agents to produce the prisoner. The agents follow the USMS policy of leaving on leg restraints. There are many occasions when only one agent is available to produce the prisoner for initial appearance. The presence of the leg restraints on the prisoner makes him/her less capable of taking advantage of the fact that only one law enforcement officer is present.

4) The District of Alaska magistrates' courtrooms are smaller than the district courtrooms. This results in a much closer proximity of the gallery to the defendant, and the defendant to the judge, witness, prosecutor, and court staff. If a prisoner is unrestrained and attempts to flee or commit and assault, he or she has much readier access to a victim; and the agents or deputies in the courtroom will have less time to respond to prevent the assault. The prisoners are also only a few yards away from a public corridor and 25 yards away from building exits.

5) None of the parties involved in the initial appearance of a prisoner have sufficient information available to conduct an assessment of the threat potential the prisoner poses. Neither do they have information relating to any mental health issues or substance abuse which might make the prisoner prone to assaultive behavior. For the safety of all persons involved in the judicial proceeding, including the prisoner, we must assume the potential exists, just as the officer on the street making an arrest must assume a subject poses a risk.

6) Once Deputy U.S. Marshals get a prisoner seated in a courtroom, they have to become reactive. They must be on guard to react to a prisoner who becomes unruly, disruptive, ill, or violent. The presence of the leg restraints puts the deputies in a better position to be able to subdue the prisoner with a minimum of force.

7) Within the last 10 years, District of Alaska USMS personnel have experienced several incidents of prisoners becoming violent. Since the institution of the leg restraint policy, however, we have had no incidents of violence with prisoners. The four examples listed below occurred prior to the existence of the leg restraint policy:

- A female prisoner was placed in a cell near a magistrate's courtroom. She became extremely loud and disruptive, requiring her removal from one cell to another. When deputies approached to move her, she became violent, attempting to kick and bite. It took four deputies to restrain the prisoner without physically harming her. The prisoner had been kept in detention on drug

2

charges because of risk of flight and an illegal immigration status. A large percentage of the prisoners produced in District of Alaska courts are facing drug charges. Many of the prisoners also have detainers from state courts or the Immigration and Customs Enforcement agency.

- A female defendant appearing before Judge Holland in a sentencing hearing became agitated upon learning her sentence, jumped up, and threw at water pitcher in the direction of the prosecutor, requiring two deputies to quickly subdue her. The deputies had no prior information indicating this prisoner would become disruptive.

- A male prisoner was being moved from a magistrate's courtroom to the cellblock when he made an attempt to grab a Deputy U.S. Marshal's weapon. It took four deputies to effectively restrain the prisoner.

- A male prisoner with mental health issues was being transported from the courthouse to a detention facility when he lunged at a transporting deputy.

8) Almost every other USMS district can relate episodes of prisoner violence. An incident which fully highlights the dangers a prisoner can pose occurred in Salt Lake City, Utah in July of 2005. An inmate was brought into the cellblock to await his sentencing. As he entered the cellblock area, he asked to have his restraints removed (waist chain and handcuffs) so he could use the toilet. The Deputy U.S. Marshal advised the inmate he was proceeding to court almost immediately, so he would have to wait.

After the prisoner returned from court, deputies removed his restraints. The prisoner used the toilet in the cell, and in doing so, was able to retrieve a weapon he had secreted in his rectum. The weapon was fashioned from the top portion of a pair of toenail clippers. It was flattened and sharpened to make it an edged weapon. The prisoner had attached a handle to the blade to make it easier to use. After retrieving the weapon the prisoner moved to the front of the cell and began stabbing another prisoner. The video of the assault clearly shows its speed and viciousness. Chief Deputy U.S. Marshal Wanda Phillips recently viewed the video and heard a description of the assault from the Chief Deputy from the District of Utah. The victim was hit approximately 20-30 times within the span of a few seconds. An investigation of the incident indicated the attacker did not know his victim, nor did he have any reason to assault him.

Because the prisoner was attempting to use the toilet before his court appearance, a practical person must believe he intended to retrieve the weapon and have it with him in the courtroom. If he had accomplished this, his victim would likely

have been his defense attorney, the prosecutor, a Deputy U.S. Marshal, court clerk, court reporter, or the judge.

District of Alaska USMS managers are attempting to get a copy of this video to include as an attachment to our leg restraint policy justification.

In summary, I believe the facts contained in this letter provide justification for a District of Alaska USMS policy requiring leg restraints on prisoners appearing in non-jury proceedings.

Sincerely,

Randy M. Johnson

Randy M. Johnson
United States Marshal

4